Judge Mills
delivered the opinion oí the Court.
A patent for 113,482 acres of land issued from the Commonwealth of Virginia, to Hen-JT Banks and Richard Claibourne, as tenants in common, which forms the subject of the present controversy.
Samuel Blight filed his bill in the court below, claiming the title thereto, by the following chain of conveyances.
A conveyance for 5277 acres thereof, as the quan= tity is styled in the face of the deed, (but as the }30vinctary described in the deed shows, upwards of 20,000 acres) from Henry Banks and Richard Clair bourne, the patentees, dated in 1787, to Pierre Louis Philippi Galbot De Lomerie , and also a deed confirmation of the same land to De Lomerie by the same patentees, dated in 1799.
A conveyance from De Lomerie to Blight himself, which completes the claim as to that quantity.
As to the residue of the tract which forms the principal controversy, he sets out the following:
A letter of attorney from Henry Banks to his co-partner, Richard Ciaibourne, authorizing him to se^ convey all his interest in this and other lands, dated on the 25th January, 1786.
A conveyance from Richard Claibourne for himself, and as attorney in fact for Henry Banks, dated 6th January, 1794, of the whole residue of the tract, to James Trenchard.
Conveyance from lhe assignees to
Deed of Keighan to Ervin and Jones,
Ervin to Jones.
Jones’ deed to Bllshtp
Trenchard’s deeds to Allison.
Alljson to Shannon.
Shannon to Bl7a,r!’.Ij-yl!3 amli‘ries-
Conveyance ím]a Br?a"’.
Blight’s bill alleging tbs deeds in his claim of title, registered"according to law, aijd proved' and others are lost, and praying deeds of confirmations.
*193 A conveyance for one third of the same tract, from Trencharcl to Barges Allison, dated 28th November, 1798»
A conveyance from Thomas Campton, William Tilghman and Joseph Hopkins, commissioners of bankruptcy, under the late law of the United States on that subject, (Burges Allison having been under a commission issued for that purpose, previously declared a bankrupt,) to Thomas Ervine and Samuel Jones, as assignees, dated 27th February, 1801.
A conveyance from Thomas Ervine and Samuel Jones to John Keighan, dated 2d June, 1803.
A conveyance from Keighan, dated on the same day with the latter, to the said Thomas Ervine and Samuel Jones, as individuals.
A conveyance from the said Thomas Ervine and wife, to the said Samuel Jones, for his moiety of the third undivided, dated 4th September, 1809.
A conveyance from said Samuel Jones, dated on the 80th of November, 1809, to Samuel Blight, the complainant, which in addition to the. conveyance from De Lomerie, completes his claim to De Lo-merie’s part and an undivided third of the residue.
For the remaining two thirds which we, according to this statement, have left in James Trench-ard, he sets out the following conveyances:
Two conveyances from said Trenchard to David Allison, dated 28th November, 1796, each for one third of the tract.
A conveyance from David Allison to William Shannon, .dated on the 11th of June, 1797.
A conveyance from William Shannon to Guy Bryan, John Lyle and JohnFries, dated on the 13th of November, 1809.
Apd finally a conveyance from said Bryan, Lyle and Fries to Samuel Blight, the complainant, dated 23d October, 1809.
In his original hill,' he makes the patentees and all the intervening grantees parties, and states that *194 none of these conveyances, except those to himself immediately, have been proved or acknowledged and recorded as the laws of this country direct, that of course the title remains in jeopardy from creditors and innocent purchasers, and that it is great difficulty that any title can be established at law because the conveyances cannot be given in evidence without parol proof, that some of the witneses are dead, and some of the original conveyances are lost and cannot be found, and he prays that his title may be rendered complete as a recorded title, by the decree of the chancellor.
Banks’ answers, and ^a^stthe Other defendants‘
Equity has jurisdiction parties^6 * ^ through whom the h^itleTy68 deeds lost or not register-to law°toinS execute deods of con-be registered e regís ere .
bills^ancKhe chancellor’s jurisdiction to clear the obstructions6 and settle complicated ’oaiheVfitoS to land.
Banks, the patentee, answered, and against the rest of the aforenamed parties the bill is taken as confessed, after publication made. We shall have occasion to notice the contents of the answer of Banks, or rather of his different answers, as there are several, as we progress with the cause.
The first question made in his favor, is the jurisdiction of a court of equity. It is. asserted that such defalcations in completing a defective title, are generally the fault of the grantees, and that equity will not sustain a bill for such purpose. On this point we will not long dwell; for we cannot doubt tbe propriety of the interference of the chancellor in such case. Equity will frequently interfere to remove difficulties in land titles, where a party can-n°t proceed without difficulty at law, when the conveyances are lost, or in the possession of the opposite party, or where the parties are numerous, and dle Pro°f hard of access, and in many such cases if jjg]1(;en the burden, and settle many controversies and bring then intoji small scope.
And where the title is .purely legal, for such and causes, to those we have enumerated, equi-W bas carved out a branch of jurisdiction, and a class of hills, termed in the hooks ejectment bills, in which not only the title is made clear, but the possession decreed also. No reason is perceived by us, why the present case is not within the spirit of these cases. The difficulties in an unrecorded title, esPecially if it is derived through a long chain of conveyances, is familiar to our courts in this couri- *195 try. The danger to which the title is exposed from two classes of persons, creditors and subsequent purchasers is often great, and the facilities afforded from a title which can be read in evidence without other proof than the authentication annexed, are felt by every one who has to bring his title into court for attack or defence, and the present case will furnish a good comment on the propriety of the interference of the chancellor. As to the default of the grantees in not having their title properly recorded, it may furnish a good reason for taxing them with the costs of renewing the title, provided the defendants make no opposition to a confirmation of title.
Answers of Banks» their UieiTfncon-sistencies as to the execu-deedsof conveyance, alleged in the £e equino* an admission of. them,
Effects of re-stmmenitrto proye prf0P deeds,
The next point relied on, is, that there is no proof of the different conveyances set up by Blight, and that Banks has not admitted them in his answers, taking them in mass. On this point we are unable to reconcile all the different answers put in by him. In the first, he neither expressly admits or denies them, in a second he expressly admits them, but requires his adversary to compound with him, and admit some of his affirmative statements in return, and in a third he goes so far as to say he does not admit or believe they were made or executed. But independent of his admission in one of his answers, it is impossible to read any of them, and not perceive that the writer labored under a weighty consciousness, that the following deeds and documents actually exist and are genuine, to-wit: the letter of attorney from him to Claibourne; the first deed of Claibourne to De Lomerie; the conveyance from Claibourne to Trenchard, and the conveyances from Trenchard to both Burges and David Allison.
In addition to this, the deed of confirmation from Banks and Claibourne to De Lomerie, in 1799, which Banks does not pretend to dispute, not only alludes to the power of' Claibourne, but also in express terms, recites and declares the fact of the conveyance from Claibourne to Trenchard, which had then taken place after the first, and before the second deed to De Lomerie, and there is an express stipulation, that the patentees had conveyed to none *196 Other except Trenehard, in which the part of De Lomerie was excepted, and we may add, that in a schedule rendered by Banks, when he took the benefit of the insolvent laws of Pennsylvania, and which he now sets out and relies on, there is an express acknowledgement of the conveyances from Trench-ard to David and Burges Allison. To this point therefore the title of Blight is indisputable.
Deeds exccti-ted abroad, tered hero618" within oighteen months.
Tbe original Certified^cd-jpy must be produced to tl-ecording 0 loer‘
Banks’ cross the land to'Ct payment of the balance of die pnr-chase money.
The deed of confirmation from Banks and Clai bourne to De Lomerie, was acknowledged in pro pCr tjinc an(] manner before the mayor of Philadelphia, anc* certified by him, under the seal of the corporation, which did entitle it to' record in this State, under our acts Of Assembly; if it had been offered in proper time to the proper office. It was recorded here in due time, that is in less than eighteen months, which has been held by this court, the correct time for conveyances made abroad for lands in this State, under the proper construction of our laws regulating this matter. See Taylor vs. Shields’heirs, 5 Litt. 395.
But we discover that by the certificate of the recording officer in this State; an authenticated copy Die ¿eeth ai‘d not the original was presented to, and recorded by him, which renders the registry of the deed defective, and entitles Blight to come into a COurt of equity to remedy this defect. His own deed is mdcíe and recorded in proper time, and We shall for the present leave the part of De La-meric, till we consider the defects of the other deeds to the remaining part of the land.
As to this sale from the patentees to Trenehard, Banks makes the same defendants to his answer, which Blight had made in his bill, as well as others, and also makes Blight a defendant to his answer, and charges that the land when bought by Trenehard was hot all paid for, and that there was a balance due, and exhibits a bond for upwards of £8000 sterling, with some credits thereon endorsed, executed by Trenehard, Burges Allison and Joseph Barnes, by Trenehard as agent, and lie claims a lien upon the land for this sum, and that if the debt is not paid to him, the land may be subjected thereto, if *197 the title is not released to hint, which lie first requires, and one of the most important questions made is, on this lien.
Admission or silence of a part of the defendants, cannot effect others who have an interest in the facts alleged.
Otherwise, where the other defendants have no interest in the matter confessed.
Where the vendor pursues the land for the consideration money, and a part has been sold to a purchaser, though with notice, the balance unsold shall be first subjected.
We have already seen that the title is established from the patentees to David and Burges Allison, and it has been insisted that as the bill is taken as confessed against the rest, the confession is sufficient as against them, and all concerned. It will be admitted that the confession is clear evidence against the defendants, who are silent, and indeed as to all others, whose interest cannot be prejudiced by the confession.
As the title has passed from Banks and Clai-bourne, it is evident that they have no right to interfere with the fact admitted by the answers or silence of other grantors, unless they shall make out a valid lien, and the admissions of the defendants against whom the bill is taken as confessed, shall operate against his lien, in which case, their silence cannot prejudice hiim
We must therefore, notice this lien. It has no bearing on the part sold to De Lomerie, as his part is evidently paid for, and only applies to the residue of the tract sold to Trenchard.
We shall not notice all the objections made to this lien in argument; but shall barely observe, that although the note itself, has no connexion on its face, or by its face with the conveyance to Trenchard, as the deed is dated sometime before the note, yet the deposition of Burges Allison, which is used, states the note was given for this land, and Banks says in his schedule before alluded to, that it was given for this and other lands sold at the same time. At the time Trenchard purchased this tract, he bought also many other tracts in Harrison county, Virginia, amounting in the whole to about 150,000 acres, which were included in the same deed to Trench-ard. What lias become of these lands, no where appears in this cause; whether Trenchard yet retains them, or whether they are now in the hands of purchasers, either with or without notice, is not shown,and equity would not enforce the lien a *198 gainst even a purchaser with notice, while there way enough of the lands remaining in the hands of the original purchaser to satisfy the demand. On this the lien ought to fall, and it is evident that this bond was given for all.
If all the lands be sold, and in the same situation, they shall be sub- , iected rata-bly.
A lien for the purchase money cannot be enforced against a purchaser for a valuable consideration without notice.
'Deed to such a sub-purchaser, read against the original vendor, claiming a lien, on the bill of the grantee, taken pro confess» against the grantor.
In a bill against the grantors, in a long chain of conveyances, not regularly registered, for a deed of confirmation, it is no de-fence for the patentee, that he had not been Paid’where it appeals ienee, were for valuable noticed °U
*198 The farthest therefore it could extend to this tract would be rateably only, if all tbe lands were in the same situation.
We have already settled the fact of title in David Allison, in two conveyances. His purchase seems entirely unconnected with the purchase of Burges Allison, and there is no proof in the cause, tending to fix notice on him, that Treftchard owed any part of the purchase money. The conveyance to Trench’-ard not only acknowledges payment on its face,, but by a receipt in full, written on the deed, payment is fully acknowledged. David Allison had therefore aright to take the fact of payment as true, and must be presumed to have done so, unless it is proved that he was expressly warned of the contrary. All the part therefore of David Allison, must be held to be discharged from this lien, if it exists at all. For no principle is better settled, than that a lien for the purchase money, which is a creature of a court of equity, cannot be enforced against a purchaser for a valuable consideration' without notice. Blight therefore has a right to read, on the admission made by taking the bill as confessed, all the conveyances from David Allison to him, free from the objection of Banks, who cannot be injured thereby, as he has lost his lien, if any be had, by the purchase of David Allison.
It has been urged in argument, that Banks is only a defendant resisting a recovery against him, and that in this attitude equity will give no relief against him, as to the title of this land, if the money is not paid. If Blight held an equity only, and was endeavoring to enforce it, this might be true. But his situation is otherwise.' He holds the legal estate, and only prays that the evidences thereof may he made more safe and credible than they are- To refuse him any aid because Banks has never been paid, might prejudice him, and could never aid *199 Banks, as he, on his cross bill could not enforce his hen, because none exists. Blight, therefore, being clearly entitled to the share of David Allison, as well as that of De Lomerie, the quantity which supposed lien could reach is greatly lessened, as well as that portion of the debt which could reach it. A
Where the gal title, and °'!b goes to nave a deed confirma-the" defendant 8 cannot resist could not enforce as actor.
La and ^posses™8 sion.
vendor takes personal se-carity for the can-" notafter-wards assert even^pur-^ chaser with notice,
The part of Burges Allison therefore only remains to be considered. He had notice that the debt was not paid, and we need not say, that the commission of bankruptcy against him would destroy it; for we cannot admit that this debt is any lien at all. Difficulties exist against it, owing to the lapse of time, and the presumption against it from that quarter, and it is in proof, that part of the land at least, has been held in possession under the purchase of Trenchard ever since the year, 1795.
But this is not all, Burges Allison was not a part* ner with Trenchard, according to his own testimony, as well as the exhibits in the cause, in the original purchase. He was then unknown to Banks and Claibourne. He after wads agreed to become interested with Tx’enchard, by contract with him, and Claibourne accepted hjm in the bond in all respects as a security! Barnes also has his hand and seal affixed by Trenchard, which was designed ás a farther'security. But whether Trenchard had or had not authority to do this, we need not inquire. The security of Burges-Allison is enough. The se-curily of a bond from the purchaser alone was held aufficient formerly , to destroy the lien. This has since been often overruled; but it is still maintained by all the cases, that personal security removes thelien, and that by accepting it, the seller waives . the lien, and others knowing this, may purchase with safety. Another fact renders it evident that Allison was a surety. As ¿we have observed, the bond was given for this and other lands also, in which Burges Allison had not the most remote interest or claim. Why then did he unite in the bond to secure more than what he himself owed, if it was not as surety for Trenchard. Nor will the attitude of Banks as a defendant 'not yet paid, against a holder of the legal estate help him in this *200 respect. The application is not made to get the ¡e-gal title from him; but only to renew evidences once existing and held free from any lien which he might have retained. There is then no difficulty in Blight reaching his titles down to himself, on the admission made by the silence of the other defendants. But we may add to this, that the exibits or conveyances from the commisioners of' bankruptcy, down to Blight, are proved by the depositions in the causp,
An order of publication, directing the advertisement eight weeks, hut ii fact published for two months, is sufficient. 1
Depositions filed under the agreement with Lewis.
We are aware that exceptions have been taken to the orders of publication. In the original record they may not be complete; but they are shown to be so by the additional record brought up by certiorari. One of the orders, it is true, directs the insertion to be made by the editor, eight weeks only, instead of two months, and it has been frequently held by this court, that proof of insertion for eight weeks only, is insufficient. But the proof is clear that the order was, in fapt, inserted two months in succession, and it has never been held, that if the order said eight weeks, it vitiated the publication made . the proper length of time. The note of the time of insertion in the order, is designed as a direction to the printer, and is not essential to the validity of the order, and if the printer, knowing that this direction to insert it, is not long enough to comply with the law, shall continue the publication for a sufficient length of time, no reason is perceived for holding the publication defective.
It has also been urged, that as all the bills were dismissed in the court below proforma, and an agreement added to the decree, that the cause should be tried here, and the same objections be made to evidence here, as could have been made in the court below, the depositions to which we have alluded as proving the exhibits, cannot be read, because they were taken to be used in another cause and another court, and copied and tiled here, and that Banks has never agreed that they shall be read.
But there.is an agreement made that they shall be read iiere by another party, which it'is insisted, must be extended to Banks.
History of Lewis’ claim.
Suits, decrees and agreements between Banks and. jL,ewis.
This introduces another character or party, not heretofore noticed, and we will proceed to give a succinct history of his claim and standing, and with this objection ,to the deposition, consider the pther questions azdsing out of his case.
Banks appears to have drawn an order jn favor of Abraham. Morehouse for $50,000, tp be paid in lands in Kentucky, on his agent Cuthbert Banks, residing in Kentucky; Cuthbert Banks discharged part of this order in lands, the balance was assignee! by Morehouse to Ia. H. N. Tot Bastrop, who applied to Cuthbert Banks, the agent, for the payment thereof, and Cuthbert Banks, by articles of agreement or executory contract, in the year 1800, sold the tract now in contest, with othérs, tp Bastrop, who immediately, or in the same year, mortgaged them to said Morehouse, to secure him in the payment of a sum of money expressed in the mortgage. On this mortgage Morehouse filed his bill against Bas-trop in the late Danville district court, and obtained a decree of foreclosure and .sale, at which John Blanton bought this tract of 113,482 acres. The executors and heirs of John May having a judgment against Blanton, sold this tract of land by execution against him, and Thomas Lewis became the purchaser thereof, asid obtained the conveyance of the sheriff.
Lewis then filed his bill in the Hardin circuit court, against Henry Banks and Claiborne, to compel them to convey the title, and having advertised against them as non-residents, obtained a decree for the whole tract, and a conveyance was accordingly made to him, by a commissioner appointed by that court. Henry Banks, some tiine after this decree, filed his hill of review, to set aside this decree of Lewis, and at the hearing thereof, the same court reversed and set aside this decree at the prayer .of Banks, and annulled the title of Lewis. Lewis and H. Banks then made an adjustment of their controversy, in which H. Banks released all his title in this tract to Lewis, and agreed that the decree on the bill of review should be set asidp, and *202 the first decree reinstated, which was accordingly done by the court.
Lewis introduces himself into this cause, and is made party.
Slight’s amended bill against the representatives of Lewis and Banks.
Lewis’ and Banks’ answer to Blight, exhibiting their partnership agreement.
Lewis’ agreement to the reading of the depositions, held to be obligatory on Banks.
This latter proceeding took place pending this suit. Lewis appeared in this cause, and prayed to be made a defendant or a party thereto, which was granted to him, and he filed a cross bill against both Blight and Henry Banks, praying that each might be compelled to convey and release their title to him, whicli was' answered by both H. Banks and Blight, and this was tried and decided by the same decree, which we are now revising, and the bill of Lewis was dismissed; he having previously departed this life, the suit was revived in the name of his executors and devisees.
Blight, on discovering the friendly manner in which H. Banks had released his titlc to Lewis, and ratified the decree, which had been reversed in the bill of review, filed an amended bill in this cause, suggesting that both H. Banks and Lewis had entered into a combination to defraud him, and that an article of agreement to that effect, and for the purpose of embarrassing his title, existed between them.
In their answer they exhibit the article in which they agree .that Banks had conveyed all his title to Lewis, and that their claims should thus be united, and that they would sell the land and divide the proceeds equally between them, so soon as, by their united effort, they could defeat Blight in this suit. In the same article it is stipulated that the whole control and management of this suit shall be given up to Lewis, in as strong terms as can well be expressed, and all that Lewis had done or should do in the -cause, was ratified and declared to be binding on H. Banks.
Now, before this time Lewis had made an express written agreement in this cause, that the depositions now objected to, should be copied, and filed, and read in this controversy. This agreement must have been known to Banks at the time he solemnly submitted his case to the management of Lewis, and conveyed to him. Indeed, by this agreement Lewis or his devisees must be taken as H. Banks himself. *203 They hold the title of. Banks, such as it is, one half for themselves and the other half as trustee for Banks, except certain parts which Lewis had preViously agreed to part with to others, which he reserves wholly for himself. Of course, if these depositions can be read against Lewis, they can he read against Banks also, for his claim, as well as the fate of his case is vested in Lewis, by his own act, yet binding upon him,
Banks’ eroga against sentatives of Lewis; their answer, and tacase on the controversy with
Vendor, who after his con-^5 chiim^o the land, and sells and con-other^cannot subject the claim of his vendee and his alienees to sale, for a the consideration money,
*203 It is true, that before this cause was tried, Banks appears to have rued this contract, and files an answer in the nature of a cross bill against Lewis’ devisees and executors, praying that this contract with, and conveyance to Lewis, may be set aside, alleging that Lewis, when he made this contract, had defrauded him, (as he alleges was the case in all his different sales of this land, from that to Trenchard in 1794, to this with Lewis in 1818,) by representing that he, Lewis, possessed and held the claim of Blight. This is denied by the answer of Lewis’ executors, and we do not well perceive how it can ever be proved; because the writings between them expressly shew that neither Lewis or Banks had Blight’s claim, and that they were struggling to defeat it in this suit, and that the design of their agreement was to make their united effort bear more forcibly against it. It is true that this part of this controversy between Banks and Lewis’ devisees is still retained in the court below, to be hereaiter decided, and We are not now to decide it, but are bound to look into it so far as it may have a bearing on the other parties to the suit; and looking into it for this purpose alone, we perceive nothing that weakens its obligation on Banks, or that will prevent ns from considering Lewis as Banks, as he has rested his claim in Lewis’ hands; of course these depositions must be read.
Here we are furnished with another decisive refutation of the lien set up by Banks. He has made a disposition of all his claim, both legal and equitable, to Lewis, totally incompatible with a- decree selling this land for the purchase money. Lewis is tó have certain parts thereof, exclusively to himself, and then is to hold one half of the residue. There *204 is no way of making ibis supposed hen effectual,consistent with bis disposition to Lewis, but to make it operate exclusively on the claim of Blight, and expose it to sale, leaving Lewis to reserve ids claim! as well as that of Banks.
¡Putt iSse°ii 6" to* in dis-fcliarge of hot claims to land! aim
Equity has {orenwTnd simplify the tnvncr’s evi-tie-smd°to*íé-move incum-brances and lated to aiiU" iioy his°jKw-session, add lessen the yal-ue o tie fes-tats.
resist apriorj unrecorded J Subsequent conveyance, must not only have paid the consideration money, but must have obtained a conveyance before notice.
*204 A court of equity will sell lands m discharge oí Jjfeng5 but not claims, without the land, and to offer this land to purchasers, all claims must be brought into market. At all events, this contract with Lewis shows the estimate placed by Banks himself, as weh as Lewis, on 'this lien. He did not esteem it as valuable as a union of strength with Lewis, for the purpose of defeating Blight entirely, and supposed the half of Lewis’ claim aided by his skill, was worth more than his claim on the bond, set up by him as a lien upon the land.
The question now occurs, What is to be done with Lewis and his title. Is lie to be excluded from all participation in the contest, and excluded from it holding his title, Or must he be retained and compelled to surrender it. If he had remained in the same situation in which he appeared, when he voluntarily brought himself into the controversy, he might be excluded; But he, or his representatives llow aPPeai' clothed With the claim of Banks, as well as other claims to fortify it, claiming the land; arid actually disturbing the possession; and Blight has, by an amended bill against him, claimed ^ i-jg rei¡eV<id of this burden on his title also, and that his claivri may be released. To grant this relief against him, is within the jurisdiction of the chancellor. íhe bill of Blight has become in this respect, still more like an ejectment bill, and is framed, not only to renew and simplify his evidences of title, but to remove encumbrances and claims calculated to annoy his possession, and lessen the value of the estate, and he is entitled to this relief, unless something is found in the claim of Lewis to forbid it.
The sale to Bastrop cannot stand in the way; because it was not only long after Lhfe sale to Do Lorn-' eiae anP Trenchard, but was by executory contract only, and did not inaké Bastrop a purchaser for a *205 taíuable consideration, without notice as to Trench-ard and De Lomerie; to do this, it was necessary that Bastrop should not only have paid the price, but have received a conveyance, ignorant of the former sale of the patentees, and the proof shows that he was informed of it.
Sale and conveyance, under a decree against one not having the legal title, docs not affect the holder of th* legal title, not a party;
Sale by execution, a-gaiust Blan-ton, not having the legal title, passed nothing.
Decree oh ■ tained on a publication for eight weeks, is not binding on even the par ties, but is void.
Ratification of Lewis’ claim pending the suit, ineffectual.
Lewis’ claim under the Register’s sale and deed.
The decree of the Danvilíé district court, cannot Oppose this'relief; because the mortgage of Bastrop to Morehouse was of a supposed equity only, and the decree and sale thereon could pass no more. Neither Blight, nor any under whom he claims, were parties to that suit, and cannot be more affected by the decree, than they would by a private sale by executory contract.
The sale by execution to Lewis against Blanton, the purchaser under the decree of the district court, cannot defeat Blight,-or give title to Lewis; because Blanton had at best, an apparent .equity only; and it has been repeatedly held that an equity cannot be sold under ex ecu! ion.
Thé decree Of the Hardin circuit court in favor of Lewis against Banks cannot resist this relief, although it was obtained before the commencement of this suit, because Lewis was apprized of the title of Blight, as appears in the proof, before he received his deed under that decree; and on looking into that record, we discover that the order of publication was not made the length of time required by law, and of course according to the decisions of this court, the decree itself was void, and not binding on the parties thereto, and consequently, it can have no operation on those who were not parties, and Blight, and those from whom he derived title were not parties.
Nor ban the ratification of that decree by Banks, ímd bis conveyance to Lewis in pursuance thereof, defeat the relief prayed by Blight against Lewis; because this was done pending the suit and with the avowed design of defeating its operation.
But as to the part sold to De Lomerie, Lewis sets up a different claim from any heretofore stated. He produces the conveyance of the register of the land *206 office ünder a sale for taxes, as the property of t)é Lomerie, made to Charles Helm, and from Helm to himself, of the whole tract, by the bounds of De Lomerie’s deed. It seems that the tract was listed for taxes in the name of De Lomerie at the quantity of 5,277 acres, the nominal quantity in his deedi One sale was made by the Register, and was returned by him to the Auditor to be 1,900 acres off of the western end, and the sale of that quantity was recorded by the auditor. This return and record, seems to have been since changed to 4,900 acres, and with this, the Register’s certificate recited in the face of the deed agrees. Afterwards a subsequent sale was made of 377 acres, supposed to be the balance Of the tract, and these two sales are combined by a subsequent Register in the same deed, and tbs whole tract is conveyed, by the Register’s conveyance, according to the boundaries of the deed from Banks and Claiborne to De Lomerie, including upwards of 20,000 acres.
Surplus in tracts of land sold in several parcels by the Register, at different sales, does not pass by bis deed’s for the whole tract.
Sale and conveyance of the Register, by mistake, where the taxes had been paid, does not pass the title.
Where there is a variance between the quantity of the tract, returned as sold, by Use Register to the Auditor, and certificate given the purchaser by the Register, the return made to the auditor shall prevail, and his subsequent alteration of his books is ineffectual.
*206 It is evident that the conveyabce of the Register of the whole tract is not good. For waiving the question whether the purchaser would not be compelled to take his first purchase in quantity, laid off first at the west end^ and then his second purchase in its proper place, which would probably be the correct mode, it is clear that the two sales could not be combined, because the conveyance, according to the second sale, ought not to have been made. Blight had redeemed it, and paid the taxes thereon, and obtained a quietus, and it must have been owing to the oversight of the officers that the conveyance was made. This vitiates the conveyance as to the whole tract, and if good for any part, it can only be for the first purchase.
There is some difficulty in ascertaining what that purchase is.
The certificate of the Register recited in the conveyance, who was not the Register who made the sale, is 4,900 acres, while the quantity returned sold by the Register and recorded in the Auditor’s office is 1,900 acres, and which of these is to prevail is the question, As the entry and return of the *207 sale by the Register and record of the officer requir-edly law, is kept in the custody of the officers of the law, and the certificate is kept by the party, and operates as a mere memorandum, directory to the surveyor, and has no validity in passing title, we concede the preference to the record, and conceive it ought to prevail as fixing the true quantity; and although the return of the Register and record of the Auditor has been since changed by the Auditor to conform to the certificate, yet this ohange was not authorized, and we cannot- deem the sale valid for more than 1,900 acres, to be taken off from the westwardly end of De Lomerie’s survey, by a line parallel to the most westwardly boundary, terminating on the Ohio at one epd and the line of De Lom-erie’s survey, which runs parallel to the river, including the proper quantity, and the devisees and executors of Lewis must release all but that boundary.
Query, as to the effect of the Register’s deed inclu-dingtoo great, a quantity of land.
Register’s sale heldprí-, ma facie correct.
Surplus accounted for by the fact of the boundaries, including other superior adverse claims.
Whether the deed from the Register already obtained, as it includes this land really sold, as well as other lands which it ought not to have included, is valid as to the part really sold, we need not en-quire.
But we predicate our decision on this point, on the fact, that so much was really sold, and as there is no evidence impeaching the sale, it must be held as prima facie correct, according to former opinions of this court.
Another objection to granting any relief as to this part of D.e Lomerie, is the extraordinary surplus contained therein, and it is urged that ought to raise a presumption of fraud. We say presumption, because there is no other evidence of the fact. To this we reply, that this presumption is destroyed by its also appearing on the face of the deed itself, that it contains within its boundaries more than the quantity named, and the reason of the boundaries being enlarged is reasonably accounted for by showing that there were other claims in the names of others, within that boundary supposed to be superior, and it is reasonable to suppose that the parties intended to include that'quantityafter these claims *208 were excepted; and therefore they enlarged the boundary, and it.is shown that the quantity convey? ed will not greatly exceed the quantity named, after these claims are deducted.
Blight’s claim held (;he superior.
Trenchard’s contract with Barbour, Barrett and Servantes, to settle the lands by tenants, to bo interested in the paper •town Ohio-pimingo.
Settlepaenls by the tenants under the contract with Barbour and others.
*208 We therefore conclude that the sales, made by the patentees of this tract of land now held by Blight’s heirs must prove successful over all the su bsequent sales and conveyances of the same land, with the exception aforesaid, as they are the oldest and are unirnpeached, and were completed by conveyances of the legal estate, good against all, except two descriptions of persons — creditors and innocent purchasers.
There is still another incumbrance on the title of Blight not yet noticed, which he seeks to remove by an amended bill. In the deed from Claibourne and Banks to Trenchard, the part before sold to De Lomerie was excepted, But Trenchard in his sub? sequent conveyances and dispositions of the land, did not make this exception, and undertook to con? vey the whole, including the part of X)e Lomerie; and before he sold to David and Burges Allison, he laid off a town upon the part of De Lomerie, probably by protraction only, with both in and out lots marked thereon, and also on the same diagram, divided the whole tract into farms of five hundred acres each, and contracted with Coburn Barrett, Henry Servantes and David Barbour, that they should come to the land, or one of them, and bring upwards of two hundred families, who should settle the lands as tenants, or lessees, on an annual rent. Each settler who should settle and faithfully pay his rent for seven years, and clear a certain quantity of ground, was to be entitled to lots in the ideal town named Ohiopiomingo, which, then, no doubt, appeared brilliant on paper; and other privileges were to he allowed them, and to Barrett, Servantes and Barbour, certain portions of land were to be allowed for the performance of the stipulations on their part.
An attempt was made to perform this agreement. David Barbour arrived on the land in 1795 or 1796, with sundry families-, though not near enough to *209 comply with the contract, most of whom settled clown at the mouth of Doe Run, on the site of the town of Ohiopiomingo, and some attempts were made by Barbour to make the requisite leases. Subject to this arrangement Trenchard conveyed to David and Burges Aliison. Most of those settlers became dissatisfied with their new situations, and were disquieted by other claims appearing on the land. As they were from Europe, it is probable that some of them were dissatisfied with the wilderness into which they were led, and foundthem-selves in a country where unsettled lands conld be had in abundance, without rent. They, therefore, began to transfer their possessions to others, until all, or nearly ali, abandoned the enterprise. Barbour staid on th.e land for several years, endeavoring to recruit his settlement. Some of those settled on the land, and that outside of the claim of Do Lomerie, remained thereon, or those claiming under them, till Blight himself entered in Í8Í0; since which time Ire has been possessed by himself or tenants; and now, in his amended bill, he makes Barbour, Barrett, Servantes and some who claim under them, or their representatives, where any of them have died, defendants, and prays relief against these contracts of Trenchard, and requires them to be surrendered, on the ground that the enterprise failed, and there was a total failure on the part of Barrett, Servantes and Barbour to comply with their contract. We perceive no objection to granting this relief also, as this contract is a dormant burden on his title, and may affect the enjoyment thereof or lessen its value, and the proof is clear that the contracting parties only attempted, and utterly failed to comply with their stipulations, and that they have done nothing to entitle them to a conveyance of any portion which they might have been entitled to by a compliance.
Contract with Barbour &c. not having been performed, but remaining a dormant bur den on tho title, is rescinded, and a release oi-dered.
Where the defendants in a bill for a new deed, in confirmation of former deeds, lost or ed, for the purpose of simplifying the title, answers, not resisting the relief, the complainant may have his decree and deed but pay the costs of the suit.
*209 One other question has been made in argument worthy of notice. It is insisted that if Blight, or his representatives, shall be found entitled to a completion of his title by proper registry of conveyances, it ought to be granted at his costs, as the non registry of these deeds was not owing to the gran *210 tors. As before observed, if the defendants had have met his application to a court of equity, by a willingness to perfect his title, it would, no doubt, have been equitable to have left the costs on him. But in this case a different rule must prevail with regard to the defendants Banks and Lewis’ devisees and executors. Banks has, by subsequent transfers of this land, embarrassed it to the great prejudice of his ñrst sale. Lewis has bought up one claim after another, still knowing of Blight’s, and' finally they formed a union for the purpose of more effective opposition, and through every stage of the cause, Blight has met with the most decided resistance, until the record is swelled to an inconvenient and unusual size. Under these circumstances we cannot say that either Lewis’ representatives or Banks can escape from the burden of the contesl, unnecessarily enlarged and increased.
Decree dismissing the bills of Banks and Lewis’ devisees affirmed.
Decree dismissing Blight’s bill reversed, and mandate for a conveyance.
■Costs.
petition for a re-hearing.
Upon the whole case, therefore, the decree of the court below, so far as it dismissed the cross bills of Banks and Lewis’ representatives must be affirmed with costs. And so far as it dismissed the bill of Blight, (whose heirs now prosecute it, he having died pending the appeal,) it must be reversed, with costs, as to Banks and Lewis’ executors, and the cause be remanded, with directions to the court below, to enter up a decree against all the defendants, that they release and convey to Blight’s heirs all the tract of 118,482 acres of land, with the exception of nineteen hundred acres, based on the whole extent of the western boundary of De Lomerie’s deed, and extending with bis line eastwardly on one side, and with the Ohio river on the other, till a line parallel to the base shall include that quantity.
Banks must pay the costs of his appeal and Banks and Lewis’ executors and devisees the costs of Blight’s appeal.